**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| REBECCA S. HOLBROOK, | ) | CASE NO. 3:10-cv-1927 |
| | ) | |
| Plaintiff, | ) | JUDGE ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Rebecca S. Holbrook ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.  For the reasons set forth below, the

Magistrate Judge recommends that the Commissioner's final decision be REVERSED

and this case REMANDED for further proceedings consistent with this Report and

Recommendation.

## I.  PROCEDURAL HISTORY

On April 16, 2007, Plaintiff filed applications for DIB.  (Tr. 10.)  On March 27, 2007, Plaintiff filed an application for SSI.  (Tr. 10.)  In both applications, Plaintiff alleged a disability onset date of December 31, 2006.  (Tr. 10.)  Plaintiff's applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 10.)  On December 21, 2009, an ALJ held Plaintiff's hearing.  (Tr. 10.)  Plaintiff appeared at the hearing with counsel and testified.  (Tr. 10.)  A vocational expert ("VE") also appeared at the hearing and testified.  (Tr. 10.)  On February 19, 2010, the ALJ found Plaintiff not disabled.  (Tr. 20.)  On July 9, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On August 30, 2010, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On February 28, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 14.)  On May 20, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 17.)  Plaintiff did not file a Reply Brief.

Plaintiff asserts two assignments of error:  (1) the ALJ failed to resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"); and (2) the ALJ improperly assessed Plaintiff's credibility.

## II.  EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 38 years old on the alleged disability onset date.  (Tr. 18.)  She has at least a high school education and is able to communicate in English.  (Tr. 18.)  She

2

has past relevant work experience as a fast food worker, fast food service manager, machine packager, and cashier.  (Tr. 18.)

###### B.    Medical Evidence

In September 2006, Plaintiff slipped and fell down three stairs in the rain.  (Tr. 37, 256.)  On October 9, 2006, Plaintiff presented to Marion General Hospital's emergency department with a complaint of back pain relating to her fall.  (Tr. 256-57.) Dr. Paul Culler, M.D., attended to Plaintiff and reported that an x-ray of Plaintiff's lumbar spine showed L4-5 spondylolisthesis.[1]  (Tr. 257.)  Dr. Allan Reier, M.D., also interpreted the x-rays of Plaintiff's lumbar spine and indicated "[m]ild to moderate L4-L5 disc degenerative disease associated with the listhesis."  (Tr. 254.)  Dr. Culler reported that there was no evidence of an acute herniated disc or a fracture, and diagnosed Plaintiff with status post fall lumbar strain with L4-5 spondylolisthesis and a right posterior pelvic contusion.  (Tr. 257.)

On October 27, 2006, Plaintiff presented to the emergency department with a complaint of back pain.  (Tr. 258.)  Dr. Steven Draeger, M.D., attended to Plaintiff and reported that Plaintiff "[r]eally does not have any chronic illness" and "[d]oes not have a history of chronic or recurrent back problems or arthritis."  (Tr. 258.)  Dr. Draeger further explained that Plaintiff had some nerve-related symptoms but no weakness; Plaintiff's straight leg raising was negative and her pain was primarily in her back; and Plaintiff's legs had no edema, swelling, or discoloration.  (Tr. 259.)  Plaintiff was discharged with instructions to follow up with the Dr. Konfala Center Street Clinic for further evaluation.

---

[1]  Spondylolisthesis is the "forward displacement . . . of one vertebra over another."  Dorland's Illustrated Medical Dictionary, 1743 (30th ed. 2003).

(Tr. 259.)

On November 21, 2006, Plaintiff presented to the emergency department with a complaint of low back pain.  (Tr. 261-63.)  Dr. Melissa Knarr, D.O., attended to Plaintiff and indicated that Plaintiff "did have a chronic history" of such pain.  (Tr. 261.)  Dr. Knarr indicated that Plaintiff reported her pain started three days prior when she push-started her car.  (Tr. 216.)  Dr. Knarr diagnosed Plaintiff with a lumbar strain, gave Plaintiff prescriptions for ibuprofen and Ultram, and discharged Plaintiff.  (Tr. 262.)

On April 27, 2007, Dr. Dorsey Gilliam, M.D., filled out a medical source statement at the request of the Bureau of Disability Determination.  (Tr. 246-48.)  Dr. Gilliam indicated that he examined Plaintiff only once, on April 16, 2007.  (Tr. 246, 248.)  Dr. Gilliam assessed Plaintiff's physical residual functional capacity ("RFC") as follows.  Plaintiff could stand and walk for 2 to 3 hours in an 8-hour workday, and for 30 minutes to 1 hour without interruption.  (Tr. 248.)  Plaintiff could sit for 4 to 5 hours in an 8-hour workday, and for 1 to 2 hours without interruption.  (Tr. 248.)  Plaintiff could lift only up to 5 pounds occasionally.  (Tr. 248.)  Plaintiff was moderately limited in her abilities to push and pull, bend, and perform repetitive foot movements.  (Tr. 248.)  Plaintiff was not significantly limited in her abilities to reach, handle, see, hear, and speak.  (Tr. 248.)  Dr. Gilliam indicated that Plaintiff's limitations could be expected to last 12 months or more.  (Tr. 248.)

On May 5, 2007, Plaintiff presented to the emergency department with a complaint of low back pain.  (Tr. 277-78.)  Dr. John Stein, M.D., attended to Plaintiff and

4

diagnosed Plaintiff with sciatica.[2]  (Tr. 278.)

On May 9, 2007, state agency consultative physician Dr. W. Jerry McCloud, M.D., performed a physical RFC assessment of Plaintiff.  (Tr. 267-74.)  Dr. McCloud's assessment is as follows.  Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for about 6 hours in an 8-hour workday with normal breaks.  (Tr. 268.)  Plaintiff was unlimited in her ability to push and pull except to the extent that she was limited in her ability to lift and carry.  (Tr. 268.)  Plaintiff could frequently balance and kneel; occasionally climb ramps and stairs, stoop, crouch, and crawl; and never climb ladders, ropes, and scaffolds.  (Tr. 269.)  Plaintiff had no manipulative, visual, or communicative limitations.  (Tr. 270-71.)  Plaintiff should avoid all exposure to hazards such as machinery and heights.  (Tr. 271.)  Dr. McCloud noted that Dr. Gilliam's medical source statement was significantly different than his own opinion; however, Dr. McCloud explained that he gave Dr. Gilliam's medical source statement little weight because Dr. Gilliam indicated that Plaintiff could lift only 5 pounds occasionally but "is able to move all of her extremities and had 5/5 strength." (Tr. 273.)

On August 5, 2007, Plaintiff presented to the emergency department with complaints of pain in her mid-back that radiated to both legs and numbness in both legs.  (Tr. 299.)  Dr. Lawrence Lewis, M.D., attended to Plaintiff and reported that Plaintiff's symptoms were related to her fall eleven months earlier.  (Tr. 299.)  Dr. Lewis

---

[2]  Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect." Dorland's Illustrated Medical Dictionary, *supra* note 1, at 1666.  Sciatica "is also used to refer to pain anywhere along the course of the sciatic nerve."  *Id.*

was of the impression that Plaintiff suffered back pain with sciatica and indicated that Plaintiff's condition was chronic.  (Tr. 299.)  Plaintiff was discharged in stable condition with a prescription for Vicodin.  (Tr. 299.)

On November 16, 2007, Plaintiff underwent lumbar fusion surgery performed by Dr. Robert Crowell, M.D.  (Tr. 294.)

On February 18, 2008, Dr. Donald Miller, M.D., indicated that an x-ray of Plaintiff's lumbar spine revealed post-surgical changes at L4-L5 that "seem to be progressing and showing no complication."  (Tr. 348.)

On October 27, 2008, Plaintiff presented to the emergency department with complaints of pain in her low back that radiated into her legs.  (Tr. 289-92.)  Dr. William Collier, M.D., attended to Plaintiff and reported the following.  Plaintiff reported that her pain began two months prior and increased to become unbearable over the prior few days.  (Tr. 289.)  Plaintiff also reported that her right leg occasionally "gave out" on her as it did before her surgery.  (Tr. 289.)  Straight leg raises elicited pain at 15 degrees on both legs.  (Tr. 290.)  Plaintiff was discharged in stable condition with a prescription for Naprosyn, Percocet, and Flexeril.  (Tr. 289.)

Also on October 27, 2008, Dr. Solomon Derrow, M.D., compared Plaintiff's February x-ray with a present x-ray and indicated that the present x-ray revealed maturing post-surgical changes at L4-L5, but "[n]othing acute."  (Tr. 293.)

On November 10, 2008, Plaintiff presented to Dr. Crowell for her one-year follow evaluation of her fusion surgery.  (Tr. 341.)  Dr. Crowell reported the following.  After the surgery, Plaintiff "had a fairly good result but since that time has had further deterioration with a recurrence of low back and lower extremity radicular pain extending

6

from the buttock down the posterolateral aspect of the thigh." (Tr. 341.)  Plaintiff reported weakness through her lower extremity.  (Tr. 341.)  Plaintiff walked slowly upon examniation and reported pain with flexion and extension of her legs, but she had strong and symetric motor power upon manual testing with only occasional "give-way" weakness.  (Tr. 341.)  Dr. Crowell ordered an x-ray of Plaintiff's lumbar spine to determine whether the fusion in Plaintiff's back was solid, and noted that Plaintiff's continued smoking may have delayed Plaintiff's recovery.  (Tr. 341.)

On December 1, 2008, Plaintiff presented to Dr. Crowell for a follow-up, and Dr. Crowell reported that the x-ray of Plaintiff's lumbar spine revealed "a solid, well-remodeled fusion without any other area of problem" and "no untoward effect evident." (Tr. 338.)  Dr. Crowell prescribed Plaintiff anti-inflammatory medications and recommended that Plaintiff begin a physical therapy program.  (Tr. 338.)

On January 19, 2009, Plaintiff presented to the emergency department with a complaint of back pain radiating to the right posterior thigh.  (Tr. 285-88.)  Dr. Howard Mell, M.D. attended to Plaintiff and reported the following.  Plaintiff reported her pain at 8 out of 10 in severity (Tr. 285), and a straight leg raise on the right caused Plaintiff pain at 15 degrees (Tr. 287).  Plaintiff was discharged in stable condition with prescriptions for Ibuprofen, Flexiril, and Vicodin.  (Tr. 285.)

On February 2, 2009, Plaintiff began presenting to Dr. Aleksey A. Prok, M.D., for examination and treatment of her back pain.  (Tr. 328-29.)  Dr. Prok reported the following.  Plaintiff reported "significant pain in her left leg," that she described as a "shocking, burning, sharp[] sensation with standing and walking." (Tr. 328.)  Plaintiff further reported that nothing alleviated her pain, and that her pain affected her activities

7

of daily living.  (Tr. 328.)  A straight leg raise was negative; however, "facet loading maneuvers" were positive, and Plaintiff had an antalgic gait and limited range of motion in her back.  (Tr. 328.)  Dr. Prok assessed Plaintiff with "postlaminectomy syndrome, lumbar and long-term use of medicine."  (Tr. 328.)  Dr. Prok planned to schedule Plaintiff for a series of caudal epidural steroid injections, asked Plaintiff to submit to a drug screen, and prescribed Plaintiff Vicodin.  (Tr. 328.)

On February 12 and 26, 2009, Plaintiff obtained caudal epidural steroid injections from Dr. Prok.  (Tr. 326-27.)  On both occasions, Dr. Prok reported that Plaintiff did not suffer any adverse effects from the procedures and left Dr. Prok's office in stable condition.  (Tr. 326.)

On February 23, 2009, Plaintiff presented to the emergency department with a complaint of numbness and tingling in her arm.  (Tr. 281.)  Dr. Knarr attended to Plaintiff and was of the impression that Plaintiff had "paraesthesia"[3] of the ulnar nerve. (Tr. 281.)  Plaintiff was discharged in stable condition with a prescription for Naprosyn. (Tr. 281.)

On April 20 and May 4, 2009, Plaintiff obtained Right L4 and L5 selective nerve root blocks from Dr. Prok.  (Tr. 319, 321.)  On both occasions, Plaintiff recovered in "satisfactory condition."  (Tr. 320, 322.)

On June 15, 2009, Plaintiff presented to Dr. Prok for a follow up on her back pain.  (Tr. 313-14.)  Dr. Prok indicated that Plaintiff reported constant, sharp back pain

---

[3] Paraesthesis, or "paresthesia," is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's Illustrated Medical Dictionary, *supra* note 1, at 1371.

8

rated at 6 and 7 out of 10 in severity, and that Plaintiff had an antalgic gait.  (Tr. 313.)

On August 3, 2009, Plaintiff again presented to Dr. Prok for a follow-up.  (Tr. 308.)  Dr. Prok reported the following.  Plaintiff had "postlaminectomy syndrome" and "high-risk medications."  (Tr. 308.)  Plaintiff reported pain in her lower back that radiated to her right hip, buttock, and leg.  (Tr. 308.)  Plaintiff rated her pain at 7 out of 10 in severity.  (Tr. 308.)  Plaintiff ambulated with a mild limp, and she had a positive straight leg raise on the right side.  (Tr. 308.)  Plaintiff's motor strength was 4 out of 5.  (Tr. 308.)  Dr. Prok noted that Plaintiff underwent caudal injections, but that the injections provided little to no improvement; therefore, Dr. Prok informed Plaintiff of spinal cord stimulation.  (Tr. 308.)  Plaintiff reported being interested in undergoing spinal cord stimulation, but her insurance did not cover the procedure.  (Tr. 308.)  Dr. Prok gave Plaintiff a one-month prescription of Vicodin, but he noted that he "will not be able to prescribe medication indefinitely."  (Tr. 308.)

On September 16, 2009, Plaintiff presented to the Center Street Community Clinic to obtain an RFC assessment for the Department of Jobs and Family Services.  (Tr. 302.)  The record does not indicate who evaluated Plaintiff at that time, but that person evaluated Plaintiff as follows.  Plaintiff complained of back pain that radiated to both lower extremities.  (Tr. 302.)  Plaintiff rated her back pain at 4 or 5 out of 10 in severity and at 9 out of 10 in severity when she stood and walked.  (Tr. 302.)  Plaintiff could lift 15 to 20 pounds occasionally.  (Tr. 302.)  Plaintiff had a positive right straight leg raise.  (Tr. 302.)

On October 5, 2009, Plaintiff presented to Dr. Prok for a follow up.  (Tr. 305-06.)  Dr. Prok indicated that Plaintiff reported constant, sharp back pain rated at 6 and 7 out

9

of 10 in severity, but that Plaintiff had a normal gait.  (Tr. 305.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows.  Plaintiff suffers constant burning, stabbing pain in her lower back that radiates down her right leg to her right foot.  (Tr. 38-39.)  She also suffers numbness in her left arm, although she has not been able to learn more about the cause of the numbness because she cannot not find a surgeon who will accept her insurance.  (Tr. 41.)  Two or three weeks out of the month, Plaintiff's pain is so bad that she "can barely do anything at all."  (Tr. 39, 47.)  Sitting, standing, and walking make the pain worse.  (Tr. 39.)  Cold and damp weather also aggravate her pain.  (Tr. 45.)

Plaintiff spends her days watching television, doing jigsaw puzzles, and occasionally using the computer to "surf the net."  (Tr. 43.)  She can sit in front of the computer for 20 to 30 minutes at a time before her back begins to hurt.  (Tr. 46.)  She can stand for 45 minutes at a time, but after subsequent changes in position she is able to stand for only 20 or 30 minutes at a time.  (Tr. 49.)  It is painful for Plaintiff to walk around the block, and her entire right leg "goes numb."  (Tr. 43, 48.)  Climbing stairs and walking up and down hills also hurts her back.  (Tr. 46.)

Plaintiff's doctor limited Plaintiff to lifting up to only 15 pounds, but lifting 15 pounds hurts Plaintiff's back so she tries not to lift more than 10 pounds.  (Tr. 49.)  Plaintiff is able to bathe and dress herself.  (Tr. 42.)  She can do her laundry if she is assisted.  (Tr. 44.)  Vacuuming causes her pain—especially when the vacuum bag

10

becomes full—and she needs to take intermittent breaks to complete vacuuming.  (Tr. 44-45.)  She is able to drive a car for 30 to 45 minutes before she becomes uncomfortable.  (Tr. 41-42.)  She drives her car every two or three days to go grocery shopping because she cannot complete all of her grocery shopping at one time.  (Tr. 44.)

Plaintiff's Vicodin medication makes Plaintiff sleepy.  (Tr. 41.)  However, she is able to sleep only 3 or 4 hours at a time because leg cramps wake her up.  (Tr. 42.)  Lying down is "one of the worst things," and Plaintiff must elevate her legs when she lies down to take pressure off her back.  (Tr. 47.)  She obtained injections in her tailbone, but they made her pain worse.  (Tr. 40.)  Subsequent nerve blocks did not alleviate her pain, either.  (Tr. 40.)  Plaintiff's doctor thereafter recommended a "nerve stimulator box," but Plaintiff's insurance would not pay for it.  (Tr. 40.)  Plaintiff's doctor concluded that he could do nothing more for Plaintiff.  (Tr. 40.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ read an RFC assessment from the record evidence as follows:

> Take a look at 4F, 4F suggested that the Claimant could lift ten pounds frequently and twenty pounds occasionally.  Could sit, stand or walk for six hours in an eight hour day.  Would be limited to occasional use of stairs and ramps, precluded from the use of ladders, ropes and scaffolds.  Limited to frequent balance.  Occasional stoop.  Frequent kneel.  Occasional crouch and crawl.  Precluded from work at unprotected heights or around hazardous machinery.

(Tr. 53.)  The ALJ asked the VE whether Plaintiff could perform her past relevant work if such limitations were assumed to be true.  (Tr. 53.)  The VE testified that, assuming the foregoing limitations were taken as true, Plaintiff could perform her past relevant work as a fast food worker and manager.  (Tr. 53.)  The ALJ then asked whether Plaintiff

11

could perform her past relevant work if she needed to change positions every 45 to 60

minutes in addition to the foregoing limitations, and the VE testified that Plaintiff would

not be able to perform her past relevant work.  (Tr. 54.)

The ALJ then asked whether an individual with Plaintiff's age, education, past

work experience, and all of the foregoing limitations could perform other work.  (Tr. 54.)

The VE testified that such an individual could perform work as file clerk (for which there

were 71 jobs in the region and 3,690 jobs in the state), order clerk (for which there were

183 jobs in the region and 2,638 jobs in the state), and customer service representative

(for which there were 529 jobs in the region and 22,627 jobs in the state).  (Tr. 54-55.)

The ALJ presented the VE with another hypothetical:

> Let me ask you alternatively to assume that the Claimant would be limited to
> lifting ten pounds occasionally.  She would have the same capacity to sit for
> about 45 to 60 minutes and could do so for a total of six hours in an eight
> hour day.  She could be on her feet for about 15 to 20 minutes, either
> standing or walking and could do so in either posture for two hours in an
> eight hour day.  Again, she would have the same limitations posturally I
> described in the first hypothetical along with the limitation regarding working
> around hazardous machinery or at unprotected heights.

(Tr. 55.)  The VE testified that such an individual could perform work as an

inspector/sorter (for which there were 161 jobs in the region and 2,951 jobs in the

state), assembler of small products (for which there were 704 jobs in the region and

8,644 jobs in the state), and information clerk/receptionist (for which there were 137

jobs in the region and 3,930 jobs in the state).  (Tr. 56.)

The ALJ then asked the VE whether an individual with the limitations that *Plaintiff*

described could perform any other work.  (Tr. 56.)  The VE responded that such an

individual would not be able to perform any work.  (Tr. 56.)  In response to the ALJ's

12

question of whether the VE's testimony had been consistent with the DOT, the VE

testified "I believe it has."  (Tr. 57.)

      After the ALJ concluded questioning of the VE, Plaintiff's attorney and the VE

engaged in a dialogue regarding how one could be certain that the VE's testimony was

consistent with the DOT.  The dialogue is as follows:[4]

> Q    [J]ust for purposes of the record . . . the sedentary jobs that you gave as examples, inspector, sorter, assembler and the receptionist, information clerk, do you have the DOT code numbers for those?
>
> A    I do not.  They're obsolete.
>
> Q    So I guess my next question becomes if you don't have the DOT codes, how do we know that your testimony is consistent with the DOT?
>
> A    Because all of those jobs having been defined by the U.S. Department of Labor, Bureau of Labor Market Information defines all of those jobs as being able to be learned within 30 days and therefore that's consistent with the definition of un-skilled work with the DOT.
>
> Q    Right, but in terms of being able to reference the DOT to determine the . . .
>
> A    I just told you why.
>
> Q    . . . exertional . . .
>
> A    They're all defined as unskilled work.
>
> Q    Right, but are they defined as sedentary, as light?  How is one such as myself or some reviewer supposed to go and check the DOT to determine whether or not your testimony is consistent with it if we don't have the DOT codes?
>
> A    It's not.  It's not because the DOT isn't accurate.

---

[4] Text preceded by a "Q" is quoted from Plaintiff's attorney, and text preceded by an "A" is quoted from the VE.

13

Q      Okay.  So your testimony is not consistent with the DOT for . . .

A      It's consistent with the DOT with regards to labor market information.

Q      Okay.  But if we talk about the text, the Dictionary of Occupational Titles and its companion text, the Selective Characteristics of Jobs Referenced in the DOT . . .

A      Yeah, right.

Q      . . . is it consistent with those documents?  Not with some later publication but those two . . .

A      I believe it is.

(Tr. 57-58.)  Plaintiff's attorney concluded by asking whether a hypothetical person who could not stay on task for the duration of time it took her to change positions could perform the jobs to which the VE testified.  (Tr. 58-59.)  The VE responded:  "No, I don't think so."  (Tr. 59.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled

14

by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

2.    The claimant has not engaged in substantial gainful activity since December 31, 2006, the alleged disability onset date.

15

3.      The claimant has the following severe impairment:  degenerative disc disease of the lumbar spine.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work . . . .  Specifically, the claimant can lift and carry up to 10 pounds.  She can sit for six hours total in an eight-hour workday and stand and walk for two hours total in an eight-hour workday.  She must change positions every 45-60 minutes but stay on task.  She can occasionally use stairs, stoop, kneel, crouch and crawl. She cannot use ladders, scaffolding or work at unprotected heights or hazards.  She can frequently balance.

6.      The claimant is unable to perform any past relevant work.

. . . . .

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2006 through the date of this decision.

(Tr. 12-19.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.     The VE's Testimony Regarding the DOT**

Social Security Ruling 00-4p provides that an adjudicator must elicit a reasonable explanation from a VE when there is an apparent conflict between the VE's testimony and the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict

> before relying on the VE or VS evidence to support a determination or
> decision about whether the claimant is disabled.  At the hearings level, as
> part of the adjudicator's duty to fully develop the record, the adjudicator will
> inquire, on the record, as to whether or not there is such consistency.

S.S.R. 00-4p, 2000 WL 1898704, at *2 (2000).  When an adjudicator asks the VE

whether there is a conflict between the VE's testimony and the DOT, and the VE

credibly testifies that there is no conflict, the adjudicator may rely on the VE's testimony.

See Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 606 (6th Cir. 2009).

Plaintiff contends that the VE "testified conflictingly that his testimony was not

consistent with the DOT 'because the DOT isn't accurate' but then indicated that his

testimony was 'consistent with the DOT with regards to labor market information.'" (Pl.'s

Br. 13-14.)  Plaintiff argues that the ALJ erred because he failed to inquire into and

resolve this conflict at the hearing.  For the following reasons, the Court disagrees.

The VE clearly stated that his testimony was consistent with the DOT and its

companion text, the Selective Characteristics of Jobs, regarding labor market

information derived from the United States Department of Labor, Bureau of Labor

Market Information.  The VE's testimony did not have to coincide perfectly with the

information in the DOT itself, as the DOT provides only "composite descriptions of

occupations as they may typically occur," and, therefore, "may not coincide with a

specific job as actually performed in a particular establishment or any given industry."

Barker v. Shalala, 40 F.3d 789, 795 (6th Cir. 1994).  It was not improper for the ALJ to

rely on the VE's testimony when it was based on sources other than the DOT because

the Social Security regulations provide that an ALJ may take administrative notice of

various publications issued by the Bureau of the Census, the Social Security

18

Administration, and state employment agencies in addition to the DOT.  *Id.*

Plaintiff notes that she presented evidence of actual conflicts between the VE's testimony and the DOT in a brief filed with the Appeals Council after the ALJ rendered his decision; however, Plaintiff does not explain how this is relevant to the ALJ's assessment of the VE's testimony.  "Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct."  *Lindsley*, 560 F.3d at 606  (quoting *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006)).  The ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by Social Security Regulation 00-4p because that obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009).  "The fact that plaintiff's counsel did not do so is not grounds for relief."  *Id.*; *see also Donahue v. Barnhart*, 446 F.3d 441, 446 (7th Cir. 2002) ("The ruling requires an explanation only if the discrepancy was 'identified'—that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation.  Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late.").  *But see Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (explaining that apparent conflicts include those that were so obvious during the VE's testimony that the ALJ should have noticed them and elicited reasonable explanations).

Here, Plaintiff's attorney did not identify at the hearing any of the alleged, specific discrepancies between the VE's testimony and the DOT that he was later able to

identify and present to the Appeals Council.  Moreover, Plaintiff has not explained how the alleged discrepancies identified and presented to the Appeals Council were "apparent" at the hearing such that the ALJ should have noticed, inquired about, and resolved them.  Accordingly, there is no basis to conclude that the ALJ failed to properly resolve any conflicts between the VE's testimony and the DOT.

**C.     The ALJ's Assessment of Plaintiff's Credibility**

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See* *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See* *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so."  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ's decision must contain specific reasons for his finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight he gave to the individual's statements and the reasons for that weight.  S.S.R. 96-7p, 1996 WL 374186, at *1 (1996).

In determining the credibility of a claimant's statements, an adjudicator must consider the entire case record, including the objective medical evidence, the claimant's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the

case record.  *Id.*  Although a claimant's description of her physical or mental impairments, alone, is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a),  416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence," S.S.R. 96-7p, at *1.  The ALJ must consider the following factors:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication
         . . . taken to alleviate . . . pain or other symptoms;

(v)      Treatment, other than medication, . . . received for relief of . . . pain;
         and

(vi)     Any measures you use or have used to relieve . . . pain.

S.S.R. 96-7p, at *3; *Felisky*, 35 F.3d at 1039-40.  Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility.  20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

Plaintiff contends that the ALJ erred because he failed to *discuss* most of the factors required when assessing a claimant's credibility.  But Plaintiff cites no legal authority, and the Court is not aware of any legal authority that requires an ALJ to *discuss* all the relevant factors rather than consider them.  Moreover, a review of the ALJ's decision reveals that the ALJ considered and discussed all of the relevant factors.

21

The ALJ stated that "a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitation alleged."  (Tr. 17.)  The ALJ recognized that Plaintiff suffered severe pain in her lower back that radiated down her right leg and into her foot.  (Tr. 14.)  The ALJ noted the following of Plaintiff's testimony:  Plaintiff's pain limited her ability to stand for only 45 minutes before she needed a break, and she could thereafter stand for only 20 minutes (Tr. 15.); Plaintiff's pain prevented her from performing any activity two days a month (Tr. 14); cold and damp weather, sitting, standing, and walking made her pain worse (Tr. 14-15); epidural injections and nerve blocks did not help Plaintiff (Tr. 14); Plaintiff took hot baths and lied down with her legs propped to relieve her pain (Tr. 15); and Plaintiff could drive, walk to the gas station, take care of personal needs, vacuum with frequent breaks, watch television, do jigsaw puzzles, work on the computer, cook, and clean (Tr. 15).  The ALJ further noted that Plaintiff was prescribed narcotic pain medications, and that the evidence suggested those medications controlled her pain.  (Tr. 14, 16-17.)  The ALJ concluded that "the factors set forth in 20 CFR 404.1529(c) and 416.929(c) support the residual functional capacity that has been found."  (Tr. 17.)  Because a review of the ALJ's decision reveals that the ALJ discussed the relevant factors under the law, Plaintiff's contention that the ALJ failed to do so lacks merit and is not a basis for remand.

Plaintiff also contends that the ALJ failed to assess Plaintiff's credibility properly, and that the ALJ's reasons for his credibility determination are insufficient, because the reasons are inaccurate and not based on the entire record.  For the reasons set forth below, the Court agrees.

22

The ALJ found that Plaintiff's statements regarding the extent to which her symptoms limit her were not credible for the following reasons.  Plaintiff did not require a cane or walker to walk.  (Tr. 16.)  There was no evidence in the record that Plaintiff required further surgery.  (Tr. 16.)  There was no evidence that Plaintiff suffered "true" radicular-type pain.  (Tr. 17.)  There was no evidence that Plaintiff suffered a severely diminished range of motion in her upper or lower extremities.  (Tr. 17.)  There was no evidence of guarding during any physical examinations.  (Tr. 17.)  There was no evidence of positive straight leg raises.  (Tr. 17.)  "The last physical examination of record conducted by Dr. Crowell in November 2008 indicated only mild diffuse tenderness and no evidence of severe motor or sensory abnormalities."  (Tr. 17.)  The last x-ray of Plaintiff's lumbar spine revealed a solid, well-modeled fusion with no evidence "of any sort of transitional syndrome."  (Tr. 17.)  Finally, Plaintiff's "treatment since her surgery in November 2007 has been conservative and suggests that [her] symptomatology was sufficiently controlled with narcotic medications and injections."  (Tr. 17.)  Therefore, the ALJ concluded, Plaintiff's impairments did not preclude Plaintiff from performing sedentary work.  (Tr. 17.)

Plaintiff notes that the ALJ's finding that there was no evidence of positive straight leg raises is inaccurate.  The Court agrees, as Drs. Collier, Mell, and Prok reported that Plaintiff had positive straight leg raises on October 27, 2008, January 19, 2009, and August 3, 2009, respectively.  An undisclosed examiner also indicated that Plaintiff had a positive straight leg raise on September 16, 2009.  Because Plaintiff had positive straight leg raises on several occasions and consistently complained of radicular pain from her back down her legs and into her right foot, it is not at all clear

23

how the ALJ concluded that Plaintiff did not suffer "true" radicular-type pain.

Plaintiff also notes that the ALJ erroneously failed to consider Dr. Prok's evaluations in 2009.  The Court agrees.  Although the ALJ mentioned Dr. Prok's injection and nerve block treatments on February 12 and 26, April 20, and May 4, 2009, the ALJ did not mention Dr. Prok's evaluations of Plaintiff on February 2, June 15, August 3, and October 15, 2009.  Dr. Prok's evaluations tend to undermine the ALJ's reasons for determining that Plaintiff was not credible.

Dr. Prok appears to qualify as a treating physician, as he examined and treated Plaintiff on several occasions for almost an entire year.  On February 2 and August 3, 2009, Dr. Prok assessed Plaintiff with "postlaminectomy syndrome," which contradicts the ALJ's finding that there was no evidence that Plaintiff suffered "any sort of transitional syndrome."  On August 3, 2009, Dr. Prok indicated that caudal injections did not alleviate Plaintiff's pain; that Plaintiff had "high risk medications"; that he would not be able to prescribe Plaintiff medications indefinitely; and that Plaintiff should undergo spinal cord stimulation.  This evidence appears to contradict the ALJ's finding that the record suggests Plaintiff's "symptomatology was sufficiently controlled with narcotic medications and injections."

Although an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party and does not have to make explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts, *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)), a review of the ALJ's

24

decision here shows that the ALJ did not reconcile the conflicts between his findings and Dr. Prok's evaluations—either explicitly or implicitly.  Because some of the ALJ's reasons for his determination of Plaintiff's credibility are inaccurate, and others of his reasons have not been reconciled with Dr. Prok's evaluations, the Court concludes that the ALJ has not articulated sufficient reasons to justify the weight he gave to Plaintiff's subjective statements of her symptoms and limitations.  A proper evaluation of Plaintiff's credibility is material because the VE testified that an individual with the limitations that Plaintiff described would not be able to perform any work.  Accordingly, remand is necessary so that the ALJ may reevaluate and clarify his assessment of Plaintiff's credibility in light of Dr. Prok's evaluations.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and this case REMANDED for further proceedings consistent with this Report and Recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  September 21, 2011

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

25